[No. 2833.]

## Jack Magee v. The State.

1. Practice—Substitution of Indictment—Case Stated.— It being shown that the original indictment was lost, the district attorney suggested that fact to the court by written statement, and asked that the instrument presented along with that suggestion (which, he averred, was a substantial copy of the original) be received and filed as a substitution for the lost indictment. The court sustained the motion, ordered the substitution filed, and it was filed on the same day. *Held*, that such proceeding was in compliance with article 434 of the Code of Criminal Procedure.

2. Practice—Change of Venue.—When it appears that the affidavits in support of a defendant's application for a change of venue have been met and overborne by counter affidavits, and that a jury in the case was secured before the defendant had exhausted his peremptory challenges, this court cannot hold that the defendant has been prejudiced by the order of the court refusing the motion for change of venue.

3. Same—Misconduct of the Jury.—See the opinion *in extenso* for the substance of affidavits filed on behalf of the defendant, assailing the conduct of certain jurors on the trial of the case, and for the substance of counter affidavits on behalf of the State, *held* sufficient to rebut the truth of the affidavits of the defense.

4. Theft—Fact Case.—See evidence held sufficient to sustain a conviction for horse theft.

APPEAL from the District Court of Trinity.   Tried below before the Hon. J. R. Kennard.

The indictment charged the appellant with the theft of a horse, the property of Joe Lane, in Trinity county, Texas, on the tenth day of January, 1880.   His trial resulted in his conviction, and, as punishment, he was awarded a term of five years in the penitentiary.

Joe Lane was the first witness for the State.   He testified that he lived on Mustang prairie, in Trinity county, Texas.   He lost a sorrel horse from the range on Mustang prairie some time in December, 1879, or January, 1880.   Witness last saw the animal on the range in the fall of 1879, and next saw him at the defendant's house, in February, 1880.   Witness received information that the horse was at defendant's house, and the next day after receiving such information, he went to the house of Wilfred Gassiot.   He and Gassiot went from there to the house of Josiah Johnson.   This party of three was joined by Colonel Goings, and the four went to the house of the defendant.   The defendant was turning the horse into a lot just as the party got in sight of his house.   The witness immediately recognized the horse as his.   In answer to the witness's question as to how he got the horse, the defendant said that he got the horse from a man named Perkins, who was going east; that he came by the animal honestly, and could prove that fact by Colonel Goings. Colonel Goings there and then told the defendant that he could do no such thing.

When the horse was taken from the range he had a white spot in his face.   The white hair forming the spot had been picked out when the witness recovered him.   When taken the horse was branded with the letter G.   When recovered the brand had been changed and another brand stamped on his left jaw.   Witness did not know exactly when the horse was taken from the range, but it was some time in December, 1879, or January, 1880.   The defendant did not hesitate to give up the horse.   The defendant, who lived on the public road, did not keep the horse concealed, but kept him openly in the lot in full view of the public road.   The defendant said that he still had the small black pony which he traded Perkins for the horse.   It was twelve miles from the range of the stolen horse to defendant's house. The horse was the property of the witness

and was taken in Trinity county, without his knowledge or consent.

W. R. Gassiot was the next witness for the State. He testified that he and the defendant married sisters. He was present when Lane recovered his horse from defendant. In January, 1880, witness and Colonel Goings were at work on a chimney, when defendant came up and remarked that he had bought a horse from a man named Lyons, from Madison county. Witness sent Lane word that defendant had his horse, and Lane came after it. Witness was one of the party which went with Lane to defendant's house after the horse, and he relates the occurrences at defendant's house on that occasion exactly as they were related by Lane. He said, however, that when asked by Lane where he got the horse the defendant hesitated somewhat before he said he got it from Perkins. Afterwards defendant, armed with a gun, accosted the witness, who, with Colonel Goings was at work in the woods, and said he believed that witness had informed Lane about the horse, which witness admitted. Witness did not remember falling out with defendant, and could not say whether or not he was on good terms with him.

In answer to a question for the defense, the witness denied that he said, at the house of Josiah Johnson, in the presence of Catherine Johnson, that he intended to put Jack Magee, the defendant, in the penitentiary if hard swearing would do it. Colonel Goings lived at Josiah Johnson's at that time, and both the witness and the defendant lived near Johnson's.

Colonel Goings testified, for the State, that he knew the horse in question, and saw him at the defendant's house. Witness was with Gassiot when defendant said that he had bought the horse from a man named Lyons. Witness had previously traded the defendant a brown pony for hogs. He was of the party which went with Lane after the stolen horse, and corroborated Lane and Gassiot as to what transpired at the house. He also corroborated Gassiot as to defendant accosting Gassiot in the woods about notifying Lane, and stated, in addition, that the defendant threatened Gassiot on that occasion.

On the first day of the present term of the court the defendant offered the witness a horse if witness would ride him home and not return, saying to the witness that if he would ride the horse home, and he, defendant, did not call for him again, witness would own a good $150 horse. Billy Magee and Bud John-

son were present, and the latter pointed out the horse. Witness replied that his wife was puny, and the offer was repeated. The witness denied that he requested Bud Johnson on that evening to go with him to Adams, the prosecuting attorney, and see if Adams would not permit him to go to his family. He denied telling Bud Johnson that Adams had let him off for this term of court. Witness was under no bond obligating him to appear as a witness in this case. On the ———— day of the present term a strange man calling himself Jones approached the witness, and asked him if he was a witness against defendant. Witness replied that he was, and the man gave him a two-dollar bill, saying: "Here, go and treat your friends." Witness took the money and carried it to his cousin Jim Goings, who advised witness to return it to the stranger, as there might be a trick in it. Witnsss began to feel some twinges of conscience, and, as advised, returned the money to the stranger.

The witness denied that he said to any one on the morning after Lane recovered his horse, that he, the witness, had got the defendant into a bad scrape about the horse, and would have to swear like h—l to get him out of it. He denied that he told Jenkins in the presence of Catherine Johnson that he, witness, had hired the defendant to go to Mustang prairie after his horse. He denied that he said to Catherine Johnson on that same occasion that the defendant had gone to take his horses to White Rock bottom, and that he had got the defendant to bring his horse to him, meaning the Joe Lane sorrel horse, alleged to be stolen. The witness aided the defendant to brand this horse, using a bar of iron. He did not recollect how long it was after the horse was stolen when the brands were put on. Witness declared that he did not get the defendant to go for the horse; did not receive the horse from the defendant; did not claim the horse; did not trade the horse to the defendant; did not tell the defendant to say to any one claiming the horse that he, defendant, got the horse from a man named Perkins; and did not say to the defendant that the horse was good property.

The witness further denied that he said, on the same day, in the presence of Mrs. Day, that though Lane got the horse away from defendant, it would do him no good, as he, witness, would get the horse back again. He did not say to Josiah Johnson that he, witness, had got the defendant into trouble, but that he had sold the horse to the defendant. The witness did not, at any time, tell Charlotte Johnson that he was going to

X

the defendant's to brand the horse. He did not, at any time, tell the Johnson family that he had tried and failed to catch the same horse with a noose. The witness did not tell any of the attorneys about the stranger giving him the two dollars spoken of. It was after he concluded that the two dollar transaction was a trick that the witness experienced the qualms of conscience spoken of, and returned the money. The person who gave witness the money did not say that he gave it to him to swear against defendant. The witness left the country at one time after the theft, because he had been threatened, and considered himself in danger.

James Goings, for the State, testified that on the first day of the spring term of court, the defendant offered him a horse if he would swear, in the event he failed to get a continuance, that he, defendant, got the stolen horse from Colonel Goings. He, defendant, repeated that offer on the Saturday before the Monday of the fall term, 1881. Witness replied to these offers that he did not want horses obtained that way. At the spring term, 1882, the witness went before the grand jury and had the defendant indicted for his efforts to bribe witness. At this time Colonel Goings was at witness's house. Witness denied that he said to Shoog Magee, on the day that defendant offered to bribe him the last time, that if the defendant would give him a certain horse known as "old Jerry," he would swear defendant out of this "scrape." He did, however, say to Shoog Magee that the defendant was not as good to him as he was to Lem. Foster, inasmuch as he had given Foster two hogs to swear a lie for him, and would not give the witness as much as a dinner. Witness did not remember that, in the presence of the defendant and his family and Mitch. Johnson, he offered to swear the defendant out of this trouble for "old Jerry," but if he did it was in fun he made the offer.

During the present term of court Colonel Goings showed witness two dollars some stranger had given him. He pointed out this stranger to witness. The stranger went towards Wortham's saloon, and witness and Colonel Goings followed. When witness saw the stranger and Mitch. Johnson taking a drink together, he became convinced there was a trick of some kind in the two dollar transaction, and he advised Colonel Goings to return the money, which he did. Mitch. Johnson and the defendant are brothers-in-law.

Newt. Madden testified that he saw Bud Johnson, on the first

day of court, point out a horse to Colonel Goings and say: "This is old·Jerry." Witness knew nothing more.

Sheriff R. T. Chandler testified, for the State, that when, a year previous to this trial, the defendant's application for a continuance was refused, the defendant left, and his bond was forfeited. Witness had had several *capiases* for defendant. Defendant had twice forfeited his bond, but each time came in himself, voluntarily, and surrendered. At this point the State closed.

Mrs. Nancy Gibbs was the first witness for the defense. She testified that about the first of the year 1880, she lived at Mrs. Wilburn's, four or five miles from the defendant's. About that time the defendant rode up to Mrs. Wilburn's, leading another horse. He got down, hitched the horses to the fence, and got his dinner. The house was on the public road, along which there was a great deal of travel. Apparently, the defendant was making no effort to conceal the horse. The witness did not remember exactly, but thought the horse led by the defendant was a sorrel. Miss Josephine Gibbs and Mrs. Minerva Wilburn corroborated this witness.

Mrs. Lucretia Magee testified that she was the wife of the defendant. Defendant took his horses to White Rock bottom about the first of the year 1880, and Colonel Goings got him to bring back the horse in question, which he, Goings, claimed was his property. Defendant returned that evening, bringing the horse. Next morning Colonel Goings took charge of the horse, claiming him as his property. Goings returned to Johnson's, and defendant went into the woods hog hunting, after he ate his breakfast. While defendant was in the woods, Goings returned to the house and asked where defendant was, and was told. Goings then said that he wanted to brand his horse. He took the horse behind the smoke house and branded him on the left side and jaw with an iron fragment of an old plow. Afterwards, in the presence of the witness, Colonel Goings traded this horse to the defendant for a brown pony. After this trade, Goings, in the presence and hearing of the witness, told defendant that if any one claimed the horse to tell them that he, defendant, got the horse from a man named Perkins. The defendant remarked at that time: "I think the horse is good property," and Goings replied: "Yes, he is good property." After Lane took the horse, in the presence of witness, the defendant said to Goings: "You have got me into a hell of a scrape about that horse."

Goings replied: "I will see that you are not hurt." The witness heard Jim Goings say that if the defendant would give him "old Jerry" he would swear the defendant out of this horse difficulty. The defendant did not give Colonel Goings a bunch of hogs for a horse. Colonel Goings claimed to have obtained the stolen horse from a man named Nelse Spillars.

Catherine Johnson testified, for the defense, that Colonel Goings lived at her father's house during the first part of the year 1880. She heard Jack Magee, the defendant, say that Colonel Goings had got him into a bad difficulty, and that he, Colonel Goings would have to do some hard swearing to keep himself out of the penitentiary. She heard Colonel Goings say, at Jenkins's house, that he hired the defendant to go to Mustang prairie after his horse. She also heard him, Colonel Goings, say that he would swear to a lie as quick as he would to the truth. She heard the witness Gassiot say, at her father's house, that he did not intend to let up until he sent the defendant to the penitentiary—that he would send him there if hard swearing would do it. Witness denied that she ever told Gally Ingram that she would not come to court, as she knew nothing about this case. When Colonel Goings said that he would have to do hard swearing to keep out of the penitentiary, his wife and witness were with him in Josiah Johnson's kitchen. Gassiot and defendant are brothers-in-law to the witness.

Charlotte Johnson testified, for the defense, that she heard Colonel Goings tell the defendant about his horse on Mustang prairie, which, he said, he got from a man named Spillars. She saw the witness Colonel Goings on his way to defendant's house, and asked him where he was going. He replied that he was going to defendant's to brand his horse, which defendant had brought him. This was the day after the defendant got back from Mustang prairie with the horse.

Josiah Johnson testified, for the defense, that either on the day that Lane got his horse or the next day, defendant said to Colonel Goings: "You have got me into a h—l of a scrape about that horse." Goings replied by saying that he had let the defendant have the horse. Two or three days after that, Colonel Goings left the county. He did not tell the witness that he was going to leave, and the witness knew of no cause for his leaving unless it was on account of this horse difficulty. Defendant was a son-in-law of the witness.

J. M. D. Green, a brother-in-law to the defendant, testified

that about January 1, 1880, Colonel Goings told him that he had let defendant have a horse which had been running on Mustang prairie. He traded this horse for another horse, and said nothing about trading him for a bunch of hogs.

Bud Johnson, another of the defendant's brothers-in-law, testified, for the defense, that on the first day of the present term Colonel Goings called him, the witness, and told him that he, Goings, was all right; that Adams, the district attorney, had let him off on account of his family, but that he would have to wait for the morrow's train to leave. Witness replied that he, Goings, could ride his, witness's, horse home, and keep him until witness called for him. One day during this term witness saw Colonel and Jim Goings meet. Colonel Goings exhibited some money and remarked to Jim Goings, "Here is five dollars that fellow gave me to swear Jack Magee into the penitentiary." Jim Goings asked where the man was, and Colonel Goings pointed a man out to him who was then going into Wortham's saloon. Colonel and Jim Goings followed the man into the saloon. Witness was not helping the defense "particularly."

W. Magee testified, for the defense, that Colonel Goings told him, on the first day of the present term of court, that the State's attorney had let him off, and that if defendant would lend him a horse he would leave. He, Goings, remarked: "Yonder is Jim Goings; I don't want him to see me and Jack Magee together."

Arthur Clark testified, for the defense, that Jim Goings told him, on the day that defendant's application for a change of venue came on to be heard, that he, witness, ought not to have made a supporting affidavit; that a change of venue would take all hands to Polk county, and involve trouble; that so far as the defendant getting justice was concerned, he would only get justice when he got his neck broken.

Shoog Magee testified, for the defense, that on the first day of the term of the court in 1882, Jim Goings told him that defendant did not do him as well as he did Lem. Foster; that he gave Lem. Foster two meat hogs to swear for him, but would not give him, Jim Goings, his dinner; that if defendant would give him that bay horse, he might swear for him. Jim Goings did not appear to be joking.

In addition to the questions discussed in the opinion, the motion for new trial assailed the verdict as against the law and the evidence. The motion was overruled, and appeal prosecuted.

*Robb & Stevenson* and *Granbury & Borden*, for the appellant: We submit that the affidavit of defendant in the court below, and his supporting witnesses, for a change of venue, and the evidence of the several witnesses who were sworn and examined on the trial of said application for change of venue, demanded an order by the court granting the change as prayed for. It occurs to us the court must have, in passing upon the application, given greater prominence to the negative affidavits and statements than to the affirmative. We call attention of the court to what immediately followed, to wit, the fact that the greater part of three days was consumed in getting a jury, and about sixty jurors were summoned and examined before a jury was obtained. And after the trial was over two credible persons swore that they heard the foreman of the jury, S. E. Barnes, previous to the time he was summoned and qualified himself as a juror in said cause, declare that he believed defendant, Jack Magee, stole Joe Lane's horse, and that Colonel Goings had nothing to do with it; and that if he, Barnes, should be on the jury to try defendant he would send him up—meaning to the penitentiary.

In view of these facts, we submit it was true as alleged that defendant could not get a fair and impartial trial in Trinity county, and that the court erred in overruling the application for change of venue. (See *Winkfield* v. *The State*, 41 Texas, 148; *Walker* v. *The State*, 42 Texas, 360.)

The evidence is insufficient to support the verdict. The jury must have disregarded entirely the charge of the court on the question of reasonable doubt, since the evidence on part of the defense, if it does not establish defendant's innocence, is abundantly sufficient, we think, to raise in any unbiased mind a reasonable doubt of his guilt. A mere probability of guilt is not sufficient to convict, nor is a strong probability or suspicion. (*Pilkinton* v. *The State*, 19 Texas, 214; *Barnell* v. *The State*, 5 Texas Ct. App., 113; *Grant* v. *The State*, 3 Texas Ct. App., 1; *Tollett* v. *The State*, 44 Texas, 95; *Perry* v. *The State*, 44 Texas, 473.)

The record in this cause furnishes abundant proof of misconduct by some of the jurors while they had the case under consideration; that they used improper and unlawful means to compel one of their fellow jurors, to wit, D. Ashworth, to agree to a verdict of guilty; and further, that other parties were allowed to mix and mingle with them. For this misconduct of the jury,

if for no other reason, the court should have granted a new trial. (Code Crim. Proc., Arts. 690 and 777, subdivision 8; also *Austin* v. *The State*, 42 Texas, 355; *March* v. *The State*, 44 Texas, 65; Graham and Waterman on New Trials, vol. 3, page 1444.)

The court did not give in charge all the law applicable to the case as made by the facts. A charge should have been given with reference to the testimony of an accomplice, and defining the term *accomplice.* (See Code Crim. Proc., Art. 741; *Roach* v. *The State*, 4 Texas Ct. App., 49; *Carroll* v. *The State*, 3 Texas Ct. App., 117; *Rothschild* v. *The State*, 6 Texas Ct. App., 541; *Freeman* v. *The State*, 11 Texas Ct. App., 92.)

The attempted substitution of the indictment in this cause is a stupendous failure. The record does not show affirmatively, nor by intendment even, that the substitution was made. A simple order by the court, granting the district attorney leave to substitute, is all the record shows, and is not such substitution as the law requires. Without an indictment no person can be legally held to answer a charge of felony, and the existence of such must appear by affirmative evidence; presumptions can not be indulged in so important a matter. The statute authorizing the substitution of a lost indictment is an extraordinary power given to the district attorney, in the exercise of which he performs the functious of both the court and the grand jury, and he should be held to a strict compliance with the statute, and the construction placed thereon by the courts. We contend, therefore, that the defendant in this case has been convicted upon an insufficient indictment. (Code Crim. Proc., Art. 434; *Turner* v. *The State*, 7 Texas Ct. App., 596; *Clampitt* v. *The State*, 3 Texas Ct. App., 638; *Graham* v. *The State*, 43 Texas, 550.)

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. It is shown by the record that the original indictment in this cause was lost or mislaid, and that on the twenty-fourth day of April the district attorney made suggestion of the fact to the court by written statement, and that the instrument presented with his suggestion was substantially the same as that which had been lost; and he asked that it be substituted in lieu of the original lost indictment, and that the clerk be ordered to file said substitute.

After hearing the motion the court ordered and decreed "that

the district attorney have leave to substitute lost indictment in this cause, and that the clerk of this court is hereby *ordered to file* said substituted indictment, and that this cause proceed as the law requires." It further appears from the record that the indictment *was filed* by the district clerk on the twenty-fourth day of April, 1883, the same day upon which the motion of the district attorney was made.

We are of opinion that the indictment was substituted in compliance with the provisions of Article 434, Code of Criminal Procedure. The facts that the court ordered the clerk to file the substituted indictment on the same day that the motion for substitution was made by the district attorney (April 24), and that it was filed that day by the clerk, we think sufficiently show that the indictment was, in fact, substituted. Upon comparison it will be found that these facts make out a case essentially different from the cases cited and relied upon by appellant's counsel, to wit: *Graham* v. *The State,* 43 Texas, 550; *Clampitt* v. *The State,* 3 Texas Court of Appeals, 639; *Rogers* v. *The State,* 11 Texas Court of Appeals, 608; *Turner* v. *The State,* 7 Texas Court of Appeals, 596.

When the case was called for trial, after the substitution of the indictment, the defendant made a motion to change the venue of the case, upon the ground that there existed in Trinity county, where the prose ution was pending, so great a prejudice against him that he could not obtain a fair and impartial trial in said county. This motion was supported by his own and the affidavits of two other parties, residents of the county, as provided by Article 578, Code of Criminal Procedure. Counter affidavits, controverting the grounds relied upon in the motion to change the venue, were filed by the district attorney in opposition thereto.

Evidence was heard by the court upon the issues, and amongst others testifying were the assessor, sheriff, and clerk of the District Court, who deposed that there was no personal prejudice against the defendant in the county, and that the defendant could get a fair and impartial trial in said county. The court overruled the application for a change of venue, and the record shows that a jury was obtained, and that the defendant did not exhaust his peremptory challenges when the panel was filled.

We cannot see that the defendant has made it appear that the court erred in its ruling, or that he has been prejudiced thereby. (Clark's Crim. Laws of Texas, pp. 482 and 483, and notes.)

Three grounds of objections are urged with regard to the jury trying the case. First. With regard to the juror Barnes, because it was claimed that four months before he sat upon the jury he had declared his opinion that the defendant was guilty, and that if he should be on the jury trying the defendant, he would "send him up," meaning to the penitentiary. Second. D. Ashworth, one of the jurymen, was intimidated and coerced into the finding of the verdict by his fellow jurymen. Third. That one Adkin Dean, an outsider, was with the jury, talking to and tussling with them whilst they had the case under consideration and before they had returned their verdict. These grounds of complaint as to the jury were supported by affidavits and were controverted by counter affidavits filed by the district attorney.

In his counter affidavit, the juror Barnes positively and emphatically denied that he had ever made the statements attributed to him; and several affidavits, amongst others those of the sheriff, a justice of the peace, and the county clerk, state that the juror Barnes is an upright, honest, and good citizen, bears a stainless character, is above reproach or suspicion, and is as honest and upright a citizen as there is in the county.

With regard to the coercion of the juror Ashworth by his fellow-jurors, the counter affidavits of seven of the jurymen deny that he was intimidated or coerced. Besides this, when the verdict of the jury was returned into court, finding defendant guilty, the juror Ashworth not only did not complain that he had been coerced into agreeing to it, but assented thereto without any objection. (*Fletcher* v. *The State,* 6 Hump. Tenn. Rep., 586; 3 Graham and Waterman on New Trials, p. 1444; *Gose* v. *The State,* 6 Texas Ct. App., 121.)

As to W. A. Dean, seven of the jurors, and the deputy sheriff who had charge of the jury, together with Johnson, the juror charged with tussling with Dean, all state that no such misconduct or intermingling or tussling with the jury, as complained of, ever occurred.

We do not think that the court erred in its ruling with regard to the above objections urged to the jury and its misconduct.

Considered as a whole, we are of opinion that the charge of the court fully presented the law applicable to the facts, and the testimony failing to show any complicity on the part of the witness Goings in the theft of the horse, the court did not err, so

far as he was concerned, in omitting to charge the law with regard to accomplice testimony.

A portion of one paragraph of the charge has been selected by appellant's counsel in the motion for new trial, assignment of errors and brief as being radically erroneous. The construction sought to be placed upon this particular portion of the paragraph is not warranted by the paragraph in its entirety. As stated above, we think the charge fully contained the law applicable to the case.

The record before us shows that the case has been tried, not only with earnestness and zeal, but with marked ability by the learned counsel representing appellant. We have, however, been unable to come to any other conclusion than that the defendant has had a fair and impartial trial, in which all of his rights have been awarded, and in which the evidence fully sustains the verdict and judgment of conviction. The judgment is affirmed.

*Affirmed.*

Opinion delivered June 6, 1883.